**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | **COMPLAINT FOR** |
| | § | **FORFEITURE _IN REM_** |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| | § | |
| **v.** | § | |
| | § | **Civil Action No.** |
| **196,721.18289916 USDT SEIZED** | § | |
| **FROM A BINANCE ACCOUNT** | § | **24-cv-1667** |
| **HELD BY IZUCHUKWU HENRY** | § | |
| **OKOLO** | § | |
| **Defendant,** _in rem_ | § | |
| | § | |

## AMENDED COMPLAINT FOR FORFEITURE _IN REM_

Plaintiff, the United States of America, through the U.S. Attorney for the District of Columbia, brings this amended verified complaint for forfeiture in a civil action in rem against 196,721.18289916 and 99,234.477804 in Tether cryptocurrency ("USDT") held by Izuchukwu Henry Okolo, hereinafter Defendant Property, and alleges as follows:

## STATEMENT OF THE CASE

1.     The perpetrators who carried out this elaborate scheme deceived and stole money from an individual twice by pretending to be a romantic interest through two different fake personas.

2.     The United States of America seeks to lawfully forfeit the Defendant Property to punish and deter criminal activity by depriving criminals of property used in or acquired through illegal activities; to promote and enhance cooperation among federal and foreign law

enforcement agencies; and most importantly, to recover assets that may be used to compensate victims.[1]

## JURISDICTION AND VENUE

3.      This Court has original jurisdiction of this civil action by virtue of 28 U.S.C. § 1345 and by virtue of 28 U.S.C. § 1355(a)

4.      This Court has in rem jurisdiction over the Defendant Property under 28 U.S.C. § 1355(b).

5.      Venue is proper here under 18 U.S.C. § 3238 and 28 U.S.C. § 1395(a), (b), and (c).

## NATURE OF THE ACTION AND STATURY BASIS FOR FORFEITURE

6.      The United States files this in rem forfeiture action to seek forfeiture of Defendant Property involved in, and constituting the proceeds of, violations of wire fraud, wire fraud conspiracy, money laundering, and money laundering conspiracy activity in violation of 18 U.S.C. §§ 1343, 1344, 1349, 1956(a)(1)(B)(i), 1956(a)(2)(B)(i), 1956(h), and 1957.

7.      Procedures for this action are mandated by Rule G of the supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions and, to the extent applicable, 18 U.S.C. §§ 981 and 983 and the Federal Rules of Civil Procedure.

8.      18 U.S.C. § 981(a)(1)(A) mandates forfeiture of property constituting or derived from proceeds traceable to wire fraud, conspiracy to commit wire fraud, bank fraud, or any offense constituting "specified unlawful activity" as defined by 18 U.S.C. § 1956(c)(7), or a conspiracy to commit such offense. A violation of 18 U.S.C. § 1343, or a conspiracy to commit that offense, and a violation of 18 U.S.C. § 1344 constitutes specified unlawful activity under 18 U.S.C. § 1956(c)(7)(A) as an offense listed in 18 U.S.C. § 1961(1)(B).

---

[1] *See* United States Asset Forfeiture Program, *Our Mission*, https://www.justice.gov/afp.

9.      18 U.S.C. § 981(a)(1)(C) mandates forfeiture of property constituting or derived from proceeds traceable to wire fraud, conspiracy to commit wire fraud, or any offense constituting "specified unlawful activity" as defined by 18 U.S.C. § 1956(c)(7), or a conspiracy to commit such offense.  A violation of 18 U.S.C. § 1343, or a conspiracy to commit that offense, constitutes specified unlawful activity under 18 U.S.C. § 1956(c)(7)(A) as an offense listed in 18 U.S.C. § 1961(1)(B).

10.      Wire Fraud: Title 18 U.S.C. § 1343 provides that whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, commits the violation of wire fraud.

11.      Conspiracy to commit Wire Fraud: Title 18 U.S.C. § 1349 provides that whoever attempts or conspires to commit a violation of 18 U.S.C. § 1343 shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

12.      Concealment Money Laundering: Title 18 U.S.C. § 1956(a)(1)(B)(i) provides in relevant part that whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity— . . . knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity" is guilty concealment money laundering.

13.     International Money Laundering: Title 18 U.S.C. § 1956(a)(2)(B)(i) provides that whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part—to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity, commits international money laundering.

14.     Conspiracy to Commit Money Laundering: Title 18 U.S.C. § 1956(h) provides that any person who conspires to commit any offense of 1956 or 1957 is subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

15.     Spending Statute: Title 18, U.S.C., § 1957 makes it a crime to knowingly engage or attempt to engage in a monetary transaction in criminally derived property of a value greater than $10,000 where those funds are derived from specified unlawful activity.

## PROPERTY INFORMATION

16.     The Defendant Funds were seized from multiple addresses: 196,721.18289916 USDT from the virtual currency address 1B3LCA8TZEac8o5nJt46ECY3mxDWsxHkR, and 99,234.477804    Tether    (USDT)    from    virtual    currency    address TSvvkjLb2Esnayk2xT2tCXzL7tB2xLRkJb. The currency together is hereinafter referred to as the "Defendant Property." The addresses together are hereinafter referred to as "Subject Virtual Currency Addresses."

17.    Tether is a digital currency backed by the U.S. Dollar (i.e., a stablecoin). Stablecoins are digital assets that may be pegged to a currency like the U.S. dollar or to a commodity's price, such as gold. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

18.    The Defendant Funds are currently in the custody of the United States Marshals Service.

## STATEMENT OF FACTS

19.    Virtual currency: Virtual currencies are digital tokens of value circulated over the internet as substitutes for traditional fiat currency. Virtual currencies are not issued by any government or bank like traditional fiat currencies, such as the U.S. dollar, but are generated and controlled through computer software. Bitcoin ("BTC") and Ether ("ETH") are currently the most well-known virtual currencies in use.

20.    Stablecoins: Stablecoins are a type of virtual currency designed to maintain a stable value relative to another asset, typically a unit of currency or commodity or basket of assets. USDT, commonly referred to as a stablecoin, is pegged to the value of the U.S. dollar, and one USDT is intended to be valued at $1. Tether Limited is the token manager (the owner of the smart contract) and the entity responsible for keeping funds in reserve that back USDT. Tether Limited Inc. is owned by iFinex Inc., a company registered in the British Virgin Islands and reportedly headquartered in Hong Kong.

21.    Virtual currency address: Virtual currency addresses are the specific virtual locations to or from which such currencies are sent and received. A virtual currency address is analogous to a bank account number and is represented as a string of letters and numbers.

22.    Private key: Each virtual currency address is controlled through a unique corresponding private key, a cryptographic equivalent of a password needed to access the address. Only the holder(s) of an address's private key can authorize a transfer of virtual currency from that address to another address.

23.    Virtual currency wallet: There are various types of virtual currency wallets, including software wallets, hardware wallets, paper wallets. A software wallet is a software application that interfaces with the virtual currency's specific blockchain and generates and stores a user's addresses and private keys. A virtual currency wallet allows users to store, send, and receive virtual currencies. A virtual currency wallet can hold many virtual currency addresses at the same time.

24.    Wallets that are hosted by third parties are referred to as "hosted wallets" because the third party retains a customer's funds until the customer is ready to transact with those funds. Conversely, wallets that allow users to exercise total, independent control over their funds are often called "unhosted" wallets.

25.    Blockchain: The code behind many virtual currencies requires that all transactions involving that virtual currency be publicly recorded on what is known as a blockchain. The blockchain is essentially a distributed public ledger, run by a decentralized network of computers and using that blockchain's technology, containing an immutable and historical record of every transaction. The blockchain can be updated multiple times per hour and records every virtual currency address that has ever received that virtual currency and maintains records of every transaction and all the known balances for each virtual currency address. There are different blockchains for different types of virtual currencies.

26.    Blockchain explorers are online tools that operate as a blockchain search engine. Blockchain explorers enable users to search for and review transactional data for any addresses on a particular blockchain. A blockchain explorer is software that uses API and blockchain nodes to draw data from a blockchain and uses a database to arrange and present the data to a user in a searchable format.

27.    USDT, also known as Tether, is a crypto currency that resides on multiple blockchains.  The value of USDT is tied to the value of the U.S. dollar.  Thus, one unit of USDT is represented to be backed by one U.S. dollar in Tether's reserves, making it what is known as a "stablecoin." USDT is issued by Tether Ltd. USDT is hosted on the Ethereum and Tron blockchains, among others.

28.    Ethereum ("ETH") is a cryptocurrency that is open-source and is distributed on a platform that uses "smart contract" technology.  Transactions involving ETH are publicly recorded on the Ethereum blockchain, which allows anyone to track the movement of ETH.

29.    Virtual currency exchanges ("VCEs") are trading and/or storage platforms for virtual currencies such as BTC and ETH.  Many VCEs also store their customers' virtual currency in virtual currency wallets. As previously stated, these wallets can hold multiple virtual currency addresses.  Because VCEs act as money services businesses, they are legally required to conduct due diligence of their customers (i.e., "know your customer" or "KYC" checks) and to have anti-money laundering programs in place.

30.    Blockchain analysis: It is virtually impossible to look at a single transaction on a blockchain and immediately ascertain the identity of the individual behind the transaction. That is because blockchain data generally consist only of alphanumeric strings and timestamps. But law enforcement can obtain leads regarding the identity of the owner of an address by

analyzing blockchain data to figure out whether that same individual is connected to other relevant addresses on the blockchain.  To analyze blockchain data, law enforcement can use blockchain explorers as well as commercial services offered by several different blockchain-analysis companies.  These companies analyze virtual currency blockchains and attempt to identify the individuals or groups involved in transactions.  "For example, when an organization creates multiple [BTC] addresses, it will often combine its [BTC] addresses into a separate, central [BTC] address (i.e., a "cluster"). It is possible to identify a 'cluster' of [BTC] addresses held by one organization by analyzing the [BTC] blockchain's transaction history. Open-source tools and private software products can be used to analyze a transaction." *United States v. Gratkowski*, 964 F.3d 307, 309 (5th Cir. 2020).  Through numerous unrelated investigations, law enforcement has found the information provided by these tools to be reliable.

### Overview of Confidence Scams

31.     Investment-fraud schemes like the one described in this Complaint are commonly referred to as "pig-butchering."  That term is derived from a Chinese phrase meaning to fatten up a pig before their eventual slaughter. Pig-butchering schemes begin by criminals contacting potential victims through seemingly misdirected text messages, dating applications, or professional meetup groups. Next, using various means of manipulation, the criminal gains the victim's trust and affection. Criminals refer to victims as "pigs" at this stage because they concoct elaborate stories to "fatten up" their victims.

32.     Once that trust is established, the criminal recommends cryptocurrency investment by touting their own, or an associate's, success in the field.  Means of carrying out the scheme vary, but a common tactic is to direct a victim to a fake investment platform hosted on a

website. These websites, and the investment platforms hosted there, are created by criminals to mimic legitimate platforms. The criminal assists the victim with opening a cryptocurrency account, often on an exchange such as Binance or Coinbase, then walks the victim through transferring money from a bank account to that cryptocurrency account. Next, the victim will receive instructions on how to transfer their cryptocurrency assets to the fake investment platform. On its surface, the platform shows lucrative returns, encouraging further investment; underneath, all deposited funds are routed to a cryptocurrency wallet address controlled completely by the criminals—the "butchering" phase of the scheme.

33.    Pig-butchering perpetrators frequently allow victims to withdraw some of their "profits" early in the scheme to engender trust and help convince victims of the legitimacy of the platform. As the scheme continues, victims are unable to withdraw their funds are provided various excuses as to why. For example, the criminals will often levy a fake "tax" requirement, by stating that taxes must be paid on the proceeds generated from the platform. This is just an eleventh-hour effort by the criminals to elicit more money from victims. The criminals then typically lock the victims out of their "accounts" on the platforms and the victims lose access to their funds. The criminals then move the victim funds beyond reach of law enforcement, typically by using non-custodial or "private" wallets that law enforcement cannot attribute using legal process or blockchain analysis alone; by transferring victim funds through multiple wallets before those funds reach a consolidation wallet; and by commingling victim funds with other funds in a consolidation wallet and sometimes then further transferring the funds to additional "downstream" wallets. Criminals frequently liquidate their cryptocurrency fraud proceeds by using "brokers" who agree to buy the cryptocurrency in exchange for other currency, including fiat currency.

34.     In 2020—prior to the emergence of these types of scams—confidence schemes, or romance scams, were reported to have cost U.S. victims over $600 million dollars in losses. This represented a $125 million dollar increase from 2019, and $238 million dollars from 2018, for a total of $1.43 billion dollars in losses attributed to confidence schemes from 2018–2020. Separately, during this same time-period, investment scams were reported to have cost U.S. victims over $800 million dollars.

35.     Since the emergence of cryptocurrency-based confidence scams, those same scam categories have seen their losses multiply at significant levels, reaching a reported loss of over $5.22 billion dollars in 2023 alone for confidence schemes and investments scams combined. And in 2024, that same loss increased to approximately $7 billion dollars.

### The "Markus" Scam

36.     The victim met the first woman online in December 2020 via Facebook's dating platform.  The account was in the name of Eva Markus ("Markus") and showed pictures of a woman purported to be Markus.  In addition to the Facebook account, Markus had a LinkedIn page.  According to Markus's LinkedIn page and her communications with the victim, Markus was an engineering consultant from Boston, Massachusetts, temporarily working on a mining project in Turkey.  Markus and the victim developed a romantic relationship communicating over the phone and via email.  Despite the victim's requests to communicate with Markus via video chat or meeting in person, Markus would not oblige.

37.     In January 2021, Markus told the victim that the diamond mine she was working on exploded, she was being held responsible, and she had to hire an attorney to convince the Turkish government to let her return to the United States.  From January 2021 through January 2022, Markus convinced the victim to send her over $400,000 to pay her attorney and various

other expenses relying on Markus's promise that she would return to Boston as soon as she could get out of Turkey.  To accomplish this, Markus instructed the victim to send money through bank-to-bank wires and PayPal transactions to three individuals named Wande Cars ("Cars"), Olanrewaju Taiwo ("Taiwo"), and Cafini Z ("Cafini Z").  Markus claimed that all three individuals were employees of financial institutions where she banked, and they would reroute the money to her because she could not directly access her bank accounts in Turkey. Instead, Markus told the victim to send money to the three individuals via separate PayPal and bank accounts.

38.    Cafini Z (a.k.a. Eriall Steiner) received the bulk of the initial $400,000 of the victim's funds.  Cafini Z's LinkedIn profile notes that she lives and works in the Washington, D.C., area.  The agent then conducted physical surveillance of Cafini Z's residence in September 2022 at 3404 25th Street SE, Washington D.C. 20020 and located a vehicle registered to Cafini Z parked at the address.

39.    There is no indication of Cafini Z working for any financial institution.  Records obtained via subpoena from entities Cafini Z used to receive or transfer the victim's money indicate Cafini Z claims to work as a "consultant" at Red Wheel Consulting and an "escrow agent", but her transaction activity has been flagged for being suspicious and inconsistent with escrow services. The same records indicate that Cafini Z accessed the victim's money on at least one occasion at a financial institution in Washington, D.C., withdrawing it in cash and converting it into cryptocurrency through at least one Bitcoin ATM located in Washington D.C. Red Wheel has no online presence nor formal business office, leaving its business purpose unknown.

40.     Cars and Taiwo live in England according to the addresses they have used to open financial accounts. Similar to Cafini Z, neither Cars nor Taiwo have any known professional financial credentials.

### The "Warren" Scam

41.     The victim met the second woman online in April 2022, again via Facebook's dating application.  The account was in the name of Lisa Warren ("Warren").  Warren offered the victim cryptocurrency investment services in which the victim could make quick profits; Warren also expressed romantic interest in the victim.   Their relationship developed via telephone calls, texts, and emails.  Warren told the victim that she lived in Dayton, Ohio, and claimed to work for Berox Trading ("Berox"), a company supposedly based in Coure d'Alene, Idaho.   No record of Berox as a business name on the Idaho Secretary of State corporate database.

42.     Given Warren's advertised expertise in cryptocurrency trading and hoping to make up for the losses suffered in the Markus scam, the victim invested $55,000 with Warren between April 2022 and November 2022.   Per Warren's instructions, the victim created a Coinbase account, purchased Bitcoin, and sent the Bitcoin to a wallet Warren controlled.   In December 2022, Warren told the victim that she was making profits on the money and that the victim should increase the investment.  Warren convinced the victim to sell the victim's home and invest the sale proceeds with Warren via Coinbase, in the same manner as the initial $55,000.

43.     In late 2022, the victim repeatedly asked for the money back and to meet Warren in person.  Warren returned only $15,000 and refused to meet the victim in person.  Warren's refusal to meet in person prompted the victim to travel to the address shown on Warren's

driver's license, 331 Hillway Drive, Dayton, Ohio 45405.  The victim had Warren's license information because she sent an image of it to the victim in an attempt to verify her identity. Upon arrival, the victim asked the family living at the house if Warren was there, to which they responded they did not know Warren.  Immediately thereafter, the victim visited the Dayton Police Department to report the scam.  Dayton Police confirmed that Warren's license was fake, and Warren did not live in Ohio.  As of October 2023, Warren continues to tell the victim the two will purchase a home together and that she is still making profits for him.

44.     In total, the victim sent Warren $587,197 worth of cryptocurrency after transaction and exchange fees.  Using records initially provided by the victim and, thereafter, via the blockchain public ledger, cryptocurrency exchanges, and cryptocurrency wallet addresses, the FBI has traced the Bitcoin the victim sent to Warren via cryptocurrency wallet "bc1qpfv8gy727svexhyge20n9prtzgjquu4nf4shq8" ("Warren's Wallet").

### Tracing and Freezing the Victim's Cryptocurrency Funds

45.     As part of the investigation, the FBI has traced the victim's payments to both Warren and Markus.  Though the approximately $400,000 the victim sent to Markus in the first scam has been largely withdrawn in cash by various subjects around the world, half of the approximately $600,000 worth of cryptocurrency the victim sent to Warren in the second scam has remained intact, without being extensively comingled or withdrawn.

46.     On November 30, 2023, approximately 98,972.72 Tether ("USDT") (valued at approximately $98,972.72 at the time of transfer) directly traceable back to the victim's Coinbase wallet (622a203a8040a185f8b38f18) (the "Victim's Wallet") by way of Warren's Wallet was deposited into cryptocurrency wallet TSvvkjLb2Esnayk2xT2tCXzL7tB2xLRkJb (the "FROZEN WALLET").  The FROZEN WALLET is an unhosted Externally Owner

Account ("EOA") wallet. An unhosted EOA wallet is a wallet that is not connected to any cryptocurrency exchange or service and is controlled wholly by whatever individual(s) have access to the wallet.

47. The FBI traced the victim's funds from the Victim's Wallet to the FROZEN WALLET as follows. Please note, all dates and times listed below are formatted using the Coordinated Universal Time ("UTC"). These dates and times may vary slightly depending on what blockchain explorer is used to view them. As of December 23, 2022, the victim had sent Warren a total of $587,197 worth of Bitcoin (approximately 34.5 Bitcoin) from the Victim's Wallet to Warren's Wallet.



48. From Warren's Wallet, the money was split into various wallets, with the most significant amounts going to four wallets owned individually by Chibueze Samuel Okpala, Kaodilichukwu Augustine Echem, Izuchukwu Henry Okolo, and Chinonso Ikechukwu Ezenwuba, as confirmed by records subpoenaed from Binance.

49.     The Binance records for the addresses belonging to Echem, Okolo, Okpala, and Ezenwuba contains "Know Your Customer" information.  This information shows Nigerian passports for Echem, Okpala, and Ezenwuba.  Okolo's account does not include a Nigerian passport, but access logs predominantly show his location being Nigeria and his account phone number is a Nigerian number.  All four individuals have operated their respective Binance accounts since at least 2021.  There is no information indicating they are cryptocurrency investors, nor do they have any relationship with Warren.

50.     As shown above, the vast majority of the victim's funds, approximately 31.64 Bitcoin (valued at approximately $527,355.32), was sent to 1B3LCA8TZEac8o5nJt46ECY3mxDWsxHkR1 ("Okolo Wallet"), an address associated with Binance.  Binance records confirmed the owner of this account as Henry Okolo.

51.     Binance records show that, upon receipt of these funds, Okolo swapped the 31.64 Bitcoin into Tether, receiving approximately 527,355.32 Tether (valued at approximately $527,355.32).

52.     Between January 2, 2023, at 22:43 UTC, and January 3, 2023, at 01:48 UTC, Okolo transferred 517,224.57 Tether, across four transfers, from the Okolo Wallet to the FROZEN WALLET, where the funds remained until January 07, 2023.  Those transfers are as follows:

| Asset | Transaction Hash | Date | Receiving Address | Amount |
|-------|------------------|------|-------------------|--------|
| USDT | e4e20aec8fe022edf9cf8eec5f2671d8ea0e1eab6610e02377f413e0537bca7b | 1/2/2023 22:43 | TSvvkjLb2Esnayk2xT2tCXzL7tB2xLRkJb | 30871.0629 |
| USDT | 15e929355b5602f09820ec20870c0312ea1e4f851befe99f32ea0a393e2b413f | 1/2/2023 23:58 | TSvvkjLb2Esnayk2xT2tCXzL7tB2xLRkJb | 99795.08006 |
| USDT | 11c82cf7b29831ea227527ccbe0eb2fb8aa8d0b1adaef38ab3f7fb79f8ce598e | 1/3/2023 0:13 | TSvvkjLb2Esnayk2xT2tCXzL7tB2xLRkJb | 99647.69663 |

| USDT | 544429f0ba2fe99ea2ac525bc990abe4f47846c1706fb4a313a7395dd85057ac | 1/3/2023 1:48 | TSvvkjLb2Esnayk2xT2tCXzL7tB2xLRkJb | 286910.7301 |
|---|---|---|---|---|

53.    Below are screenshots of the Whatsapp conversation between OKOLO and an account identified as "Chimezie Foster Onye…".   OKOLO identified the name of this individual as "Mr. Onyegwa (ONYEGWA)"[2].   Therefore, it is believed the full name of this individual is Chimezie Foster ONYEGWA.  It should be noted that the screenshots provided to Law Enforcement were incomplete and selectively provided.   Notably, the screenshots include only the partial conversation believed to have taken place on or about January 2, 2023, through January 3, 2023.   This gap happens to coincide with the exact time that OKOLO initially received the fraudulent funds in the Okolo wallet.  Furthermore, there is a gap in the conversation lasting from January 3, 2023, through February 10, 2023.

*(Rest of this page intentionally left blank)*

---

[2] In response to the seizure warrant previously executed on the Okolo Wallet, OKOLO sent an email to the FBI, dated July 22, 2023, in an attempt to clear his name.  Attached to this email was a 59-page PDF containing screenshots of a conversation between Okolo and Onyegwa.



54.    These screenshots show a portion of the transfers from the Okolo Wallet to the FROZEN WALLET which occurred on or about January 2, 2023, but notably, include the same values as the third and fourth transfers, pre-fee, in the above table.  As ONYEGWA instructs OKOLO to send the funds to him, it can be inferred that ONYEGWA controls, wholly or in part, the FROZEN WALLET.

55.    Prior to these transactions, the FROZEN WALLET held a balance of approximately 12,399.09 USDT and had only conducted about 14 total transfers, of which approximately six

were deposits to the FROZEN WALLET and approximately eight were withdrawals from the FROZEN WALLET.



56.    Between January 07, 2023, and January 22, 2023, approximately 327,206.86 Tether was transferred from FROZEN WALLET to address TQRYxu4K96ewnhiX3LXpHqqh2ZKsSGErxZ in ten transactions. The remaining 190,017.712452 Tether held in FROZEN WALLET was not transferred. TQRYxu4K96ewnhiX3LXpHqqh2ZKsSGErxZ was later identified as a wallet owned by Okpala and held on an exchange called KuCoin as confirmed by records received from KuCoin. KuCoin records show that Okpala then exchanged the Tether for 13.84885977 Bitcoin. That Bitcoin was then sent to a private Bitcoin address, 1KmY8FdSYmLjpGi8No3N9APbVDP9YuMSxh ("1KmY"), over the course of seven transactions between January 9, 2023, and January 14, 2023.

57.    Unrelated to the victim's funds, we saw an additional 2.18569478 Bitcoin enter 1KmY, bringing the total Bitcoin in 1KmY to 16.03455455 Bitcoin. The Bitcoin was slowly transferred to other wallets and addresses over the following months. Due to the timing and structure of these transactions, we were able to confirm which funds in 1KmY were, in fact, the victim's funds. Nonetheless, given the fact that the victim's funds were co-mingled with the additional 2.18569478 Bitcoin received by 1KmY, all the funds described in this paragraph

are assets involved in the furtherance of the money laundering scheme as they were sent and received in such a way as to obfuscate the source and ownership of the funds. Between January 2023 and May 2023, a total of approximately 7.11857579 Bitcoin was sent from 1KmY to the Okolo Wallet, split between three transactions: (1) 0.018439 Bitcoin (valued at approximately $501.678) on or about March 17, 2023; (2) 3.54919004 Bitcoin (valued at approximately $100,045.21) on or about May 29, 2023 at 01:42 UTC; and (3) 3.55094725 Bitcoin (valued at approximately $100,032.28) on or about May 29, 2023, at 02:31 UTC. We identified another 7.9175 Bitcoin that was sent from 1KmY to various other addresses and wallets unrelated to the Okolo Wallet.



58.    The subjects developed a pattern of using the Okolo Wallet as an exchange point to move the victim's funds to their various private wallets, in particular, 1KmY and FROZEN WALLET. This pattern continued from May 30, 2023, through at least November 16, 2023, according to records subpoenaed from Binance. The United States attempted to freeze the Okolo Wallet on multiple occasions, but the victim's funds were moved in and out of the Okolo Wallet too fast to enact a freeze on the spot. During this time, the United States identified a total of approximately $110,221.59 of various cryptocurrencies unrelated to the victim's funds flow through the Okolo Wallet over twenty-one transactions. At no time were the victim's funds held in the Frozen Wallet during any of those twenty-one transactions.

59.     The following is a narrative of the movement of the victim funds between the FROZEN WALLET, the Okolo Account, and 1KmY as it directly relates to the funds frozen in the FROZEN ACCOUNT.  There are multiple, smaller, transactions which are not included in this narrative due to the volume and inconsequential nature of them.  In total, there are approximately 28 of these transactions, ranging in value anywhere from 0.0001 USDT to 200 USDT.  These transactions result in a net amount of 396.25 USDT being sent from the FROZEN ADDRESS to other addresses.

60.     On around July 1, 2023, the FROZEN WALLET held a balance of approximately 30,757.97 USDT.  On or about July 2, 2023, at approximately 00:51 UTC, the Okolo Wallet initiated a transfer of approximately 291,999.00 USDT, all of which are attributable to the victim funds, to the FROZEN WALLET.  This transaction brought the FROZEN WALLET's balance to approximately 322,756.97 USDT.

61.     On or about August 8, 2023, at about 08:03 UTC, the FROZEN WALLET sent approximately 22,085.80429 USDT to the Okolo Wallet.  Binance records show that these funds were converted to Naira and withdrawn to a bank via two P2P transfers, the first occurring at about August 8, 2023, at 08:46 UTC, for approximately 10,774 USDT, and the second occurring at about August 8, 2023, at 11:19 UTC, for approximately 11,326 USDT.

62.     Following this transfer, the FROZEN WALLET held a balance of approximately 300,457.60 USDT.

63.     On or about October 20, 2023, the FROZEN WALLET held a balance of about 300,359.03 USDT.  On or about October 20, 2023, at about 09:48 UTC, the FROZEN WALLET sent approximately 100,000 USDT to the Okolo Wallet.  The Okolo Wallet then swapped the 100,000 USDT for about 3.33192818.  At about 09:59 UTC, the Okolo Wallet

sent approximately 3.34299708 BTC to 1KmY. Below is a screenshot, dated October 20, 2023, in which ONYEGWA instructs OKOLO to transfer this exact amount of BTC (pre-fee) to him at the 1KmY address. Given this, it can be inferred that in addition to controlling the FROZEN WALLET, ONYEGWA additionally controls, wholly or in part, the 1KmY address.



64.     At about 12:40 UTC, 1KmY sent approximately 3.33192818 BTC back to the Okolo Wallet. The Okolo Wallet then swaps the 3.33192818 BTC for approximately 98,721.87218722 USDT, which it then sends back to the FROZEN WALLET at approximately 13:25 UTC. Following this, the FROZEN WALLET held a balance of about 299,071.04 USDT.

65.     On or about October 23, 2023, the FROZEN WALLET held a balance of about 299,071.05 USDT.   On or about October 23, 2023, at about 22:43 UTC, the FROZEN WALLET sent approximately 150,000 USDT to the Okolo Wallet.  The Okolo Wallet held the 150,000 USDT for approximately eight hours and then reversed the transaction back to the FROZEN WALLET.  On October 24, 2023, at approximately 06:21 UTC, the Okolo Wallet sent approximately 149,999 USDT to the FROZEN WALLET.  Following this, the FROZEN WALLET held a balance of about 299,070.09 USDT.

66.     Following the above deposit, the FBI in coordination with the US Attorney's Office for the District of Colombia sent a Freeze Request to Tether.co to freeze all USDT held within the FROZEN ADDRESS on October 23, 2023.  Tether.co received the request and agreed to review it.  Tether.co did not immediately place a freeze on the FROZEN ADDRESS, allowing it to continue conduct transactions during the review process.

67.     On or about November 9, 2023, the FROZEN WALLET held a balance of about 299,070.10 USDT.   On or about November 9, 2023, at about 03:26 UTC, the FROZEN WALLET sent approximately 100,000 USDT to the Okolo Wallet.  At about 03:29 UTC, the FROZEN WALLET sent an additional approximately 100,000 USDT to the Okolo Wallet. Upon receipt of the combined approximately 200,000 USDT, the Okolo Wallet converted the 200,000 USDT into approximately 5.46127887 BTC, which was then sent to 1KmY at approximately 03:35 UTC.  This transaction is the transaction which funded 1KmY with the BTC which was eventually seized from the Okolo Wallet in the previous seizure warrant. Following this, the FROZEN WALLET held a balance of about 99,070.10 USDT.

68.     On November 30, 2023, Tether.co responded that they had agreed to place a voluntary freeze on the FROZEN ADDRESS.  At this time, the balance of the FROZEN

ADDRESS was approximately 98,972.72 USDT. As the freeze only prevents outgoing transactions, there were an additional 21 deposits made to the FROZEN ADDRESS, totaling approximately 261.761021 USDT. The current balance of the FROZEN ADDRESS is approximately 99,234.477804 USDT.

## COUNT ONE – FORFEITURE OF DEFENDANT PROPERTY
### (18 U.S.C. § 981(a)(1)(A))

1.      The Defendant Property constitutes property involved (a) domestic and international concealment money laundering transactions committed in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 1956(a)(2)(B)(i), (b) a conspiracy to engage in money laundering, committed in violation of Title 18, United States Code, Section 1956(h), and (c) violations of Title 18, United States Code, Sections 1957.

2.      Accordingly, the Defendant Funds are subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(A).

## COUNT TWO – FORFEITURE OF DEFENDANT PROPERTY
### (18 U.S.C. § 981(A)(1)(C))

3.      The Defendant Property includes property constituting or derived from proceeds traceable to wire fraud and conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1343 and 1349.

4.      Accordingly, the Defendant Property is subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(C).

## PRAYER FOR RELIEF

WHEREFORE, the United States of America prays that notice issue on the Defendant Property as described above; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that this Honorable Court issue a warrant of arrest *in rem* according to law; that judgment be entered declaring that the Defendant Property be forfeited to

the United States of America for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

_/s/ Rick Blaylock, Jr._
Rick Blaylock, Jr.
TX Bar No. 24103294
Assistant United States Attorney
United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20001
(202) 252-6765
rick.blaylock.jr@usdoj.gov

_Attorney for the United States_

**VERIFICATION**

I, Alexis Brown, a Special Agent with the Federal Bureau of Investigation, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *in rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct. Executed on this _28_ th day of _November_, 2025.

Alexis Brown
Special Agent
Federal Bureau of Investigation